IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **FIFTH & MAIN CONDOMINIUM ASSOCIATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 3:24-cv-00553** <br> **Judge Aleta A. Trauger** |
| **GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Fifth & Main Condominium Association, Inc. (the "Association") has filed a Motion for Partial Summary Judgment (Doc. No. 49) under Federal Rule of Civil Procedure 56 on Count 1 of the Complaint. (Doc. No. 1-2.) For the following reasons, the Motion will be granted in part. The Association's Motion to Strike (Doc. No. 53) will be denied.

## I. BACKGROUND

### A. The Parties and the Insurance Policy's Relevant Provisions

Fifth & Main Condominium Association, Inc. (the "Association") is a non-profit condominium association that owns a six-story condominium building located at 2115 Yeaman Place in Nashville, Tennessee. (Statement of Undisputed Material Facts ("SUMF"), Doc. No. 49-1 ¶ 1.) Great American Insurance Company of New York ("GAIC") is a global insurance carrier that is incorporated in New York and maintains a principal place of business in Ohio. (Doc. No. 1 ¶ 3.) In 2020, GAIC issued a property insurance policy (the "Insurance Policy") to the Association. (Doc. No. 49-3.) The Insurance Policy requires GAIC to "pay for direct physical loss of or damage

to Covered Property[1] … caused by or resulting from any Covered Cause of Loss" during the coverage period.[2] (*Id*. at 36.) The term "direct physical loss" is not defined in the Insurance Policy. The term "Covered Property" is defined and includes, among other things, the condominium building and the building's "completed additions" and "fixtures, including outdoor fixtures and signs." (*Id*.) A "Covered Cause of Loss" is defined as "Risks of Direct Physical Loss," unless the loss is subject to the Insurance Policy's Exclusions and Limitations. (*Id*. at 38.)

If Covered Property sustains a direct physical loss or damage, then GAIC has various options for coverage, between which it is free to choose. (Doc. No. 49-3 at 30 ("Loss Payment").) One of those options is to "repair, rebuild, or replace the property with ***<u>other property of like kind and quality</u>***." (Doc. No. 49-3 at 30 ("Loss Payment") (emphasis added).) The Insurance Policy further provides that, if the insurer decides to pay "for loss or damage on a replacement cost basis," then it has the option to pay the least expensive of (1) "the Limit of Insurance applicable to the lost or damaged property; (2) the cost to replace, the lost or damaged property with other property: (a) of comparable material and quality; and (b) used for the same purpose; or (3) the amount actually spent that is necessary to repair or replace the lost or damaged property." (*Id*. at 34 ("Valuation").)

**B. The March 2020 Tornado in Nashville**

On March 3, 2020, a well-documented tornado outbreak struck Middle Tennessee, killing at least 25 people, injuring hundreds more, and causing widespread destruction to homes, businesses, and other infrastructure. (SUMF ¶ 7.) The Association's condominium building suffered extensive property damage, including to the building's roof. (*Id*. ¶ 8.) Importantly, the

---

[1] Capitalized terms have the meanings ascribed in the Insurance Policy unless otherwise noted.

[2] The coverage period began on February 25, 2020 and ended on February 25, 2021. (Doc. No. 49-3 at 6.) There is no dispute that the tornado occurred within the applicable coverage period.

roof damage also resulted in extensive damage to the building's exterior façade, which consists of 2,787 siding panels made up of aluminum composite material ("ACM"). (*Id.*; Doc. No. 50 at 1.) In 2024, the experts employed with American Structurepoint, Inc. ("ASI"), a neutral, third-party consultant retained by the parties to conduct an independent assessment of the damage, found that 562 panels (or approximately 20% of the exterior panels) were damaged by the tornado.[3] (*Id.* ¶¶ 17–19, 21.)

To date, GAIC has reimbursed the Association for $2,470,942.08 in Covered Property damage caused by the tornado. (*Id.* ¶ 10.) This amount reflects the full replacement cost for the building's roof (which cost $909,458.85) and certain of the individual panels that exhibited visible damage due to the tornado. (*Id.* ¶¶ 10, 13; Doc. No. 49-5 ¶ 15.)

**C. The Exterior Panels**

The exterior panels were manufactured by third-party Alucobond USA and consist of three panel sections differing in color. (Doc. Nos. 49-1 ¶ 26; 49-13 ¶ 5.) Panels in two of the colors—Clay Tile and Colonial Red—have not been manufactured since at least March 2020 and therefore cannot be purchased to replace the damaged panels. (Doc. Nos. 49-1 ¶¶ 27–28; 49-13 ¶¶ 7–11.) Because replacement panels of Clay Tile and Colonial Red cannot be installed, the Association asserts that it is "impossible to have matching rust or red panels as there is no color match available for the currently installed ACM Panels." (Doc. No. 49-13 ¶ 11 (the "Schuch Aff.").)

The Association points to evidence indicating that individual panels damaged by the tornado and since replaced by GAIC are "visually distinguishable" from the Clay Tile and Colonial

[3] The parties seem to agree that approximately 20% of the exterior panels suffered direct damage due to the tornado. As indicated above, ASI concluded that roughly 20% of the total panels incurred damage. In comparison, J.S. Held, a different consultant retained by GAIC, concluded that 23% of the total panels suffered direct damage from the tornado. (Doc. Nos. 49-1 ¶ 24; 49-2 at 5.)

Red panels that were not damaged and remain on the building's façade. (Doc. No. 49-1 ¶ 31.) This includes the affidavit signed by Jason Williams, the Senior Project Manager for ASI, who oversaw the independent damage assessment of the building's exterior panels. ("Williams Aff.," Doc. No. 49-6.) Williams concluded that replacement of "individual panels instead of" every single panel would result in a "color differential" appearing on the building's exterior façade that "would be visually distinguishable." (Williams Aff. ¶ 10.) He further concluded that replacement of the damaged panels with fabricated panels painted "with the original painted codes" of Clay Tile and Colonial Red would also "not result in a reasonably uniform appearance." (*Id.* ¶ 15.) That is because a prior attempt in 2025 to replace individually damaged panels with painted, fabricated panels apparently failed to achieve a uniform appearance, as the original panels were "easily" distinguishable from the fabricated panels. (*Id.*)

Christopher Schuch, another professional who has installed over 500 ACM panel systems over the last 20 years, agreed with Williams' professional findings. ("Schuch Aff.," Doc. No. 49-13.) Schuch concluded that "[t]he panels installed by GAIC are visually distinguishable and do not match the existing Clay Tile and Colonial Red ACM Panels installed on the Building." (Schuch Aff. ¶ 19.) He also agreed with Williams' assessment that, "[i]f replacement of the Clay Tile and Colonial Red ACM panels is limited to individual panels, the color of the replacement panels will differ from the panels that are not replaced." (*Id.* ¶ 15.) Based on these two experts' conclusions, the Association believes that replacement on a unit-by-unit basis will fail to achieve an aesthetic match. (Doc. No. 49-2 at 5–6, 8–19.) To achieve a reasonably uniform appearance, the Association asserts that GAIC must replace every single exterior panel (even panels that were not damaged by the tornado) in lieu of a unit-by-unit replacement approach. (*Id.*) The estimated cost for replacing every panel exceeds $5,000,000. (Doc. No. 1-2 ¶ 50.)

GAIC disagrees that every single panel must be replaced to achieve a reasonably uniform appearance. (Doc. No. 50.) First, GAIC argues that the Insurance Policy requires the insurer to only pay for property that sustains direct physical loss or damage. (*Id.* at 8.) According to GAIC, the property that "sustained direct physical loss or damage" is limited to the individual panels that were damaged and does not include the panels that were undamaged by the tornado. (*Id.*)

In addition, the insurer claims that, "[e]ven if [the Association's] legal theories were viable," there are material factual disputes about whether a "reasonable match can be achieved."[4] (*Id.* at 5.) The insurer relies on the opinions of its retained expert, Jim Borders. ("Borders Aff.," Doc. No. 52.) Borders, who previously evaluated the building's exterior panels, believes that a reasonable color match can be achieved through other repair methods, including by replacing the damaged panels with undamaged, fabricated panels on a unit-by-unit basis. (Borders Aff. ¶¶ 7, 9–10.) In fact, Borders claims that a color match has already been identified, as evidenced by color testing that occurred in 2025. (*Id.* ¶ 10; *see also id.* at 5.) GAIC also appears to rely on a spectrophotometer analysis prepared by Neil Chrisman in January 2025, which apparently concluded that the fabricated panels "were a good color match and in compliance with manufacturer's specifications." (Doc. No. 50 at 3.)

## II. PROCEDURAL HISTORY

### A. The Association Files Suit in State Court

In April 2024, the Association filed suit against GAIC in the Chancery Court for Davidson County, Tennessee. (Doc. No. 1-2.) The Complaint asserts three causes of action. Count 1 seeks a declaration that GAIC is obligated to provide coverage and payment for the full replacement cost

[4] The court interprets GAIC's reference to the Association's "legal theories" to mean the Association's argument that the language in the Loss Payment provision requires the insurer to replicate the panel system as it appeared before the tornado.

of every single exterior panel. (*Id.* ¶¶ 54–58.) Count 2 is a common-law breach of contract claim alleging that GAIC has breached the terms of the Insurance Policy by failing to provide coverage and payment for the full replacement cost of the panels. (*Id.* ¶¶ 59–64.) Count 3 is a statutory liability claim asserted under Tenn. Code Ann. § 56-7-105, which alleges that GAIC's refusal to pay for the full replacement cost of the exterior panels was in bad faith. (*Id.* ¶¶ 65–74.)

GAIC removed the case to this court under 28 U.S.C. § 1441(a) based on diversity grounds (Doc. No. 1 ¶¶ 2–4) and later filed its operative Answer. (Doc. No. 36.)

**B. The Association's Motion for Partial Summary Judgment**

In April 2026, the Association filed an Unopposed Motion for Leave to File a Motion for Partial Summary Judgment on Count 1, regarding the extent of GAIC's coverage obligations under the Insurance Policy. (Doc. No. 47.) The court granted that motion. (Doc. No. 48.)

The Association filed its Motion for Partial Summary Judgment on June 12, 2026 (Doc. No. 49), which was accompanied by a Statement of Undisputed Material Facts (Doc. No. 49-1), a Memorandum of Law (Doc. No. 49-2), and various supporting exhibits. (Doc. Nos. 49-3 through 49-13.) On July 6, 2026, GAIC filed its Response Brief in Opposition to the Association's Motion for Partial Summary Judgment (the "Response Brief," Doc. No. 50) and a Response to the Association's Statement of Undisputed Material Facts (the "RSUMF," Doc. No. 51.) The Response Brief failed to properly cite the factual exhibits in the record. Likewise, the RSUMF appeared to assert that various material facts were disputed but did not support any of those assertions with proper citations to the factual record. Also, the RSUMF failed to state which material facts were "Undisputed," "Undisputed for Summary Judgment Purposes Only," or "Disputed," as required by Local Rules 56.01(e)(1) and (2). Instead, GAIC used words like

"admitted," "denied," and other improper words that are used to answer factual allegations asserted in a pleading. The Association filed a Reply in support of its Motion. (Doc. No. 55.)

### C. The Motion to Strike

GAIC filed the Borders Affidavit after its deadline to respond to the Association's Motion for Partial Summary Judgment had passed. *See* Doc. No. 16 at 6; Fed. R. Civ. P. 56(c)(1)(A); L.R. 56.01(d). The Association has filed a Motion to Strike the Borders Affidavit (Doc. No. 53) and a supporting Memorandum of Law. (Doc. No. 54.) GAIC responded to the Motion to Strike (Doc. Nos. 56–57), and the Association filed a Reply in support of that motion. (Doc. No. 59.)

On October 14, 2026, the parties filed a Joint Motion to Ascertain the Status of the Association's Motion for Partial Summary Judgment, requesting that the court expedite its review of the pending summary judgment motion because that decision would "significantly affect the claims and issues remaining" in the case. (Doc. No. 65.) The court granted that joint motion. (Doc. No. 66)

## III. DISCUSSION

### A. The Motion to Strike the Borders Affidavit

Before the court considers the merits of the Motion for Partial Summary Judgment (Doc. No. 49), it will first address the Motion to Strike filed by the Association (Doc. No. 53), as resolution of that motion will affect the evidence in the record that the court can consider for summary judgment purposes. In its Motion to Strike, the Association requests that the court "strike" and "disregard" the Borders Affidavit because that piece of evidence was filed by GAIC after its deadline to respond to the Motion for Partial Summary Judgment. (*Id.* at 1.) The Association further points out that GAIC neither sought an extension of time to file, nor did it seek leave to supplement the evidentiary record with, the Borders Affidavit. (*Id.* at 2.) Thus, the

Association requests that the court ignore the Borders Affidavit in ruling on the Association's summary judgment motion. (*Id.*)

The court first observes that "a motion to strike is not a proper procedural method by which to defeat supporting documents which one party finds objectionable." *Am. Cas. Co. of Reading, Pa. v. Cresent Enters., Inc.*, No. 3:13-cv-0098, 2014 WL 4271495, at *5 (M.D. Tenn. Aug. 28, 2014) (citing Wright & Miller, 5C *Federal Practice and Procedure* § 1380 (3rd ed.)). Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). As this court has previously noted, however, "[a]ffidavits and/or attached exhibits accompanying memoranda in support of motions for summary judgment, or the memoranda themselves for that matter ... are not among the documents identified as 'pleadings'" that can be stricken under Rule 12(f). *Cresent Enters., Inc.*, 2014 WL 4271495, at *5 (M.D. Tenn. Aug. 28, 2014) (quoting *Foshee v. Forethought Federal Savings Bank*, 2010 WL 2158454, at *2 (W.D. Tenn. May 7, 2010)).

The court will not disregard the Borders Affidavit, however, because of the extenuating circumstances detailed by the defendant. GAIC has represented that it "made multiple attempts to obtain Borders' executed affidavit" before its response deadline. (Doc. No. 56 at 1–2.) Those "multiple attempts" proved unsuccessful because Borders—a third-party consultant who is neither employed nor "controlled" by GAIC—"was conducting an off-site property inspection in a remote location where he did not have access to email, internet service, or other means of electronic communication necessary to review and execute the affidavit." (*Id.*) After coming back online, "Mr. Borders promptly reviewed and executed the affidavit on July 8, 2026," and GAIC's counsel filed it the day after its execution. (*Id.* at 2.) While there is no excuse for not filing a motion for

leave to file the affidavit three days late, there is no suggestion that GAIC was acting in bad faith or trying to obtain some kind of unfair advantage.

For these reasons and in the interest of deciding the issues before the court on the merits, the court will not disregard the Borders Affidavit. It will be considered, along with all of the other evidence in the record, in resolution of the Association's Motion for Partial Summary Judgment, as discussed below.

### B. The Motion for Partial Summary Judgment on Count 1 of the Complaint

The Association moves for summary judgment on Count 1 of the Complaint, which seeks a declaration that GAIC's obligation to provide coverage and payment for damaged property also includes the obligation to pay to replace every single exterior panel (even undamaged panels that incurred no damage from the tornado) in order to produce a uniform appearance. (Doc. No. 49-2 at 8.) For the following reasons, the court will grant the request for declaratory relief, albeit in a modified form.

#### *1. Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by identifying and citing specific portions of the record—including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that establish the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). If the moving party meets its burden, the burden shifts to the non-moving party to provide evidence beyond the pleadings showing a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating the evidence, the court assumes that the evidence of the non-moving party is true and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Nevertheless, the "mere existence of a scintilla of evidence in support of the" non-moving party is not sufficient to avoid summary judgment. *Id.* at 252. "There must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" non-moving party is entitled to a verdict. *Id.*

*2. Interpreting Insurance Contracts Under Tennessee Law*

Because this court has diversity jurisdiction over this case under 28 U.S.C. § 1332 (Doc. No. 1 ¶¶ 2–4), the substantive law of the forum state applies. *Andujar v. Hub Grp. Trucking, Inc.*, 161 F.4th 1014, 1017 (6th Cir. 2025). In the absence of a contractual choice-of-law provision, Tennessee courts apply the substantive law of the state in which the policy was issued and

delivered. *Progressive Hawaii Ins. Corp. v. Garza*, No. 3:20-cv-00980, 2021 WL 2952941, at *5 (M.D. Tenn. July 14, 2021) (quoting *Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 485 n.1 (Tenn. Ct. App. 2006)). The court will apply Tennessee law because the Insurance Policy does not contain a choice-of-law provision, and the parties agree that Tennessee substantive law controls. (Doc. Nos. 49-2 at 8; 50 at 7.)

In Tennessee, courts "construe insurance contracts in the same manner as any other contract." *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170, 172–73 (Tenn. 2019) (quoting *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000)). As such, insurance contracts are interpreted "using the same tenets that guide the construction of any other contract." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012). Thus, the terms of an insurance policy "'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" *Id.* (quoting *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012)).

However, "contracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Garrison*, 377 S.W.3d at 664 (Tenn. 2012) (citing *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993) ("Where the ambiguous language limits the coverage of an insurance policy, that language must be construed against the insurance company and in favor of the insured.")).

### *3. Whether the Insurance Policy Provides Matching Coverage*

The limited question before the court is whether the Insurance Policy requires GAIC to provide coverage for cosmetic matching of the building's exterior panels. As noted above, the Insurance Policy's Loss Payment provision requires GAIC to "pay for direct physical loss of or

damage to Covered Property … caused by or resulting from any Covered Cause of Loss." (Doc. No. 49-3 at 36.) If GAIC decides to provide coverage on a replacement cost basis, then it must "***replace the property with other property of like kind and quality***."[5] (*Id*. at 30 (emphasis added).)

The Association argues that it is entitled to summary judgment on Count 1 because the replacement of individually damaged panels will result in a "mismatched exterior." (Doc. No. 49-2 at 11.) Because replacement of the damaged panels will create an aesthetic mismatch, the Association contends that GAIC must replace the Clay Tile and Colonial Red panels (even ones that were undamaged) to ensure "a complete color match" and "a uniform appearance."[6] (Doc. No. 49-2 at 14–15.) The Association relies on the Loss Payment and Valuation provisions in the Insurance Policy.

First, the Association argues that the language in the Loss Payment provision obligates the carrier to replace the undamaged panels (in addition to the damaged panels) "with similar or equivalent colored individual panels" that resemble the ACM panels "prior to the loss." (Doc. No. 49-2 at 13.) That is, the Association interprets the "like kind and quality" language to require replacement of the Clay Tile and Colonial Red panels because the replacement of individual panels of a different color would not be of "like kind and quality" to the pre-loss panels. (*Id*. at 10–11.)

Second, in the Association's view, the Valuation provision bolsters this obligation, although the Association does not specify why it believes that this provision guarantees

---

5 The Valuation provision reinforces the carrier's obligation in this regard: if GAIC decides to pay "***for loss or damage on a replacement cost basis***," then it has the obligation to pay "the least of" (1) the coverage limit applicable to the lost or damaged property; (2) ***the cost to replace, the lost or damaged property with other property***: (1) ***of comparable material and quality***; and (b) used for the same purpose;" or (3) the amount actually spent that is necessary to repair or replace the lost or damaged property." (*Id*. at 34 (emphasis added).)

6 The Association is not actually requesting that "every single panel" be replaced, but rather only the Clay Tile and Colonial Red panels.

replacement of the undamaged panels under these circumstances. (Doc. No. 49-2 at 12–13.) The Association asserts that "[a] reasonable person would assume that, under these provisions, GAIC guaranteed a replacement that is visually similar." (*Id*. at 13.)

GAIC disagrees, arguing that Loss Payment and Valuation provisions require the insurer to provide replacement coverage only to property "that actually sustained direct physical loss or damage." (Doc. No. 50 at 8.) That is, GAIC asserts that the undamaged individual panels did not sustain "direct physical loss" and therefore fall outside the scope of coverage. Thus, in the insurer's view, the Association "is only entitled to the cost to repair or replace the portions of the Building actually damaged by the March 3, 2020, tornado," which would not include the mismatched panels. (*Id*. at 11.) The court interprets the policy differently.[7]

As an initial matter, the term "direct physical loss" is not defined in the Insurance Policy. So, it is not at all clear what this term means in the context of this particular policy and how to measure the "Covered Property" that experiences a "direct physical loss." Does the "Covered Property" that must sustain "direct physical loss" to trigger coverage refer to the smallest possible unit of Covered Property—*i.e.*, a single panel? Or does the "Covered Property" that experiences a "direct physical loss" refer to a larger possible unit of "Covered Property," such as a segment of panels, or even the entire panel system? Although GAIC insists that the term "direct physical loss"

---

[7] GAIC also argues that the Association is "procedurally barred" from arguing that the relevant terms of the Insurance Policy are ambiguous because it "has not asserted any claims of ambiguity as to the [Insurance] Policy in its Complaint or in the fact discovery process," and that the failure to plead ambiguity or disclose this argument in fact discovery prevents the Association from raising this argument now. (Doc. No. 50 at 6–7.) The court will disregard this argument because it is not aware of any obligation to "plead" a particular rule of contract interpretation or to disclose *legal* arguments in the *fact* discovery process. At any rate, the Complaint did allege that GAIC interprets the Insurance Policy as limiting coverage to individually damaged panels, whereas the Association interprets the Insurance Policy as requiring replacement of the entire panel system. (Doc. No. 1-2 ¶¶ 36–44.)

encompasses only "property that actually sustained direct physical loss or damage" (*id*. at 8), the insurer does not direct the court to any language in the Insurance Policy demonstrating that loss or damage to Covered Property be assessed on a granular, piece-by-piece basis. Nor does GAIC refer this court to any controlling legal authority that settles how to measure the unit of "Covered Property" that experiences a "direct physical loss."

It appears that the appropriate measurement of "Covered Property" that sustained a "direct physical loss" is subject to competing, reasonable interpretations. The definition of "Covered Property" does not state that certain sections of the structure be reduced to their individual components. It could be interpreted to mean individual panels, or to mean a larger segment of panels, or even the entire panel system. Any one of those competing constructions is reasonable, including an interpretation that measures the panels which sustained a "direct physical loss" as referring to the entire panel system. This latter view is likely the better view, particularly because "Covered Property" is broadly defined to encompass the entire "building" and its "completed additions" and "fixtures, including outdoor fixtures and signs." (Doc. No. 49-3 at 36.)

Regardless, the court need not ruminate on which interpretation is "correct." Because the term "direct physical loss" in the Insurance Policy is ambiguous and subject to multiple, reasonable interpretations, the Association's reasonable interpretation must win out. *Tata*, 848 S.W.2d at 650 ("Where language in an insurance policy is susceptible of more than one reasonable interpretation, however, it is ambiguous."); *Garrison*, 377 S.W.3d at 664 (when a "disputed provision" in an insurance contract "is susceptible to more than one plausible meaning, the meaning favorable to the insured controls.") Accordingly, the court concludes that, under these facts and given the ambiguous language in the Insurance Policy regarding the correct unit of "Covered Property" that experienced a "direct physical loss," the "Covered Property" that experienced a "direct physical

loss" refers to the entire ACM panel system, not the individual panels that comprise the panel system. This means that the entire panel system experienced a "direct physical loss" under the Insurance Policy, and that the panel system will be treated as a singular comprehensive unit.

This conclusion finds support from other courts that have interpreted nearly identical language in insurance contracts. *See Windridge of Naperville Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 932 F.3d 1035, 1041 (7th Cir. 2019) (*Windridge II)* ("The district court's conclusion that the buildings as a whole were damaged—and that all of the siding must be replaced to ensure matching—is a sensible construction of the policy language as applied to these facts."); *Nat'l Presbyterian Church, Inc. v. GuideOne Mut. Ins. Co.*, 82 F. Supp. 3d 55, 59 (D.D.C. 2015) (insurance policy's coverage of damaged property was ambiguous because it was not clear that the scope of coverage was limited "to the smallest unit possible (an individual panel, a single shingle, a specific patch of flooring) or to one larger (the entire façade, the whole roof, a continuous stretch of flooring)"); *Bertisen v. Travelers Home & Marine Ins. Co.*, 710 F. Supp. 3d 883, 891 (D. Colo. 2024) (when the insurance policy broadly defined the covered property to include the building, "it would not be unreasonable to interpret the 'property' experiencing 'direct physical loss' to refer to Plaintiffs' residence *as a whole*, such that direct physical damage to Plaintiffs' home triggered coverage.") (emphasis in the original); *Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Fam. Mut. Ins. Co.*, 857 N.W.2d 290, 295 (Minn. 2014) (finding that the entire condominium building experienced a "direct physical loss" when certain of the building's exterior siding panels were damaged in a hailstorm and "could not be matched in terms of color" to the proposed replacement panels).

The court also finds that the Loss Payment provision requires GAIC to provide matching coverage.[8] Specifically, the court concludes that the language "like kind and quality" requires a reasonably uniform appearance, and that GAIC's coverage obligations include the obligation to provide replacement panels that match the pre-loss aesthetic appearance of the exterior panels.

This conclusion also finds support from other federal and state courts across the country that have interpreted similar insurance policy language. Confronted with materially identical circumstances and contract language, the United States District Court for the District of Colorado found only two years ago "that language requiring that replacement materials be of 'like kind and quality' can reasonably be read to encompass matching coverage." *Bertisen*, 710 F. Supp. 3d at 893 (collecting cases). There, a hailstorm damaged the plaintiffs' home, including some of the tiles on the home's roof. *Id*. at 885. The damaged roof tiles, however, were no longer manufactured and identical tiles could not be obtained from another manufacturer. *Id*. at 887. The plaintiffs argued that the homeowner insurance policy required the insurance carrier to provide coverage for cosmetic matching, which included coverage for replacing the undamaged tiles. In relevant part, the homeowner insurance policy at issue in *Bertisen* provided that the insurance carrier would "insure against risk of ***direct physical loss to property***" covered under the policy, which included the home's roof. *Id*. at 890 (emphasis in the original). The policy further provided that, with respect to "[c]overed property losses," the insurance carrier would "pay the cost to repair or replace … that part ***of the building damaged*** with material of ***like kind and quality and for like use***." *Id*. (emphasis in the original).

[8] GAIC does not really argue that it has no obligation to provide matching coverage. In fact, the insurer appears to concede that it has some obligation to achieve an aesthetic match (Doc. No. 50 at 12–13), but instead argues that replacement of the entire ACM panel system is not necessary and that a reasonably uniform appearance can be achieved through less expensive means. (*Id*. at 5–6, 12.)

The plaintiffs argued that the "like kind and quality" language encompassed aesthetic matching and that the insurance carrier was required to replace undamaged Clay Tile and Colonial Red roof tiles (in addition to the damaged tiles) to ensure a cosmetic match because "simply replacing only the damaged tiles [that were no longer manufactured] with replacement tiles would leave Plaintiffs with a mismatched roof." *Id.* at 893. The court agreed, concluding that "[r]eplacing only the damaged tiles, which Plaintiffs contend would leave them with a mismatched roof, would not make Plaintiffs whole." *Id.* In fact, a mismatched roof would undermine the very purpose of "replacement-cost coverage," which "by definition provides a 'make-whole' remedy." *Id.* (citation omitted). The district court ultimately found that the policy language was ambiguous as to whether it required matching coverage, compelling the court to construe the policy's language in favor of the insured plaintiffs. *Id.* (the term "like kind and quality" was ambiguous and would therefore be construed in favor of providing matching coverage). So too here.

Other courts have reached the same conclusion. On nearly identical facts, the District Court for the District of Columbia, in *Nat'l Presbyterian Church*, addressed whether the insurer was required under the insurance policy to replace each of the exterior limestone panels at the National Presbyterian Church or just the panels that were directly damaged. *Nat'l Presbyterian Church, Inc. v. GuideOne Mut. Ins. Co.*, 82 F. Supp. 3d 55, 57 (D.D.C. 2015). The church's exterior façade is comprised of hundreds of limestone panels, some of which were damaged during a 2011 earthquake that struck Washington, D.C. *Id.* at 56. The church argued that the insurance carrier was obligated to pay for the cost to create an aesthetically matching façade because "merely replacing the damaged panels would diminish the aesthetic qualities of the façade, as the new, unweathered panels could have noticeably different coloration than the remaining panels." *Id.* at 57. The loss payment provision at issue in *Nat'l Presbyterian Church* was identical to the loss

payment provision in this case. There, as here, the loss payment provision provided the insurer with different replacement coverage options, including the option to "[r]epair, rebuild, or replace the property with other property of like kind and quality." *Id*. The court found that the term "like kind and quality . . . could, itself, be read to require matching." *Id*. at 60. Similarly, the term "'***other property of like kind and quality***' could also be read to mandate property that ***looks the same***." *Id*. (emphasis added). To drive the point home, the court reasoned:

> Imagine that an insurance company pays for repairs to one wall of an insured's dining room. The room's paint color—a light blue—is no longer manufactured. If the insurance company were to insist on a bright red or even dark blue paint—of the same quality and manufacture—just for that single wall, no one would feel that the insured had been made whole; only repainting the whole room would do that.

*Id*. The court ultimately concluded that the term "like kind and quality" in the policy was ambiguous, and that the ambiguity must be construed in favor of the insured church, which "required" that the insurance carrier provide matching coverage under the policy. *Id*. Other courts have reached similar holdings. *See Windridge II*, 932 F.3d at 1041–42 ("Due to the extent of the damage and the lack of matching siding available on the market, the better construction of this ambiguous policy is that it requires Philadelphia Indemnity to replace the siding on all four elevations of the buildings."); *Trout Brook S. Condo. Ass'n v. Harleysville Worcester Ins. Co.*, 995 F. Supp. 2d 1035, 1042–43 (D. Minn. 2014) (applying Minnesota law and holding that insurer was required to pay to replace even undamaged shingles on the insured's buildings because shingles that matched the undamaged shingles were no longer available); *Cedar Bluff Townhome Condo. Ass'n, Inc.*, 857 N.W.2d at 294 ("[W]e conclude that on the spectrum of resemblance, 'comparable material and quality' requires something less than an identical color match, but a reasonable color match nonetheless.").

The bottom line is this: the term "like kind and quality" in the Insurance Policy is ambiguous as to whether it requires the insurer to provide matching coverage. This ambiguity must be resolved in favor of the insured. The court therefore finds that the Insurance Policy provides matching coverage and that GAIC is contractually obligated to restore the exterior panel system to its pre-loss condition, which includes a similar color match.[9] *Nat'l Presbyterian Church, Inc.*, 82 F. Supp. 3d at 60. As the evidentiary record stands, however, the court declines to rule that GAIC's obligation to ensure a reasonably uniform appearance requires wholesale replacement of the panel system at this time. Instead, the court will grant limited declaratory relief.

#### *4. The Court Declines to Declare that GAIC is Obligated to Replace the Entire ACM Panel System*

Based on the current record, the court cannot conclude that GAIC's contractual obligation to provide matching coverage requires wholesale replacement of every single panel. That is because the parties appear to dispute whether a similar color match can be achieved through some other repair method. The Association argues that replacement of the ACM panel system is required to achieve a similar color match. For evidentiary support, the Association relies on the affidavits signed by its two expert consultants, Jason Williams and Christopher Schuch—both of whom agree that replacement of individual panels would result in a color differential on the building's exterior façade. (Williams Aff. ¶¶ 14–15; Schuch Aff. ¶¶ 15–20.)

---

[9] The court also does not credit GAIC's argument that, "[u]nder the Plaintiff's reasoning, damage to a single ACM panel could require replacement of all 2,787 panels." Doc. No. 50 at 11.) As an initial matter, those are not the facts before the court and the Association has never argued such an expansive interpretation of the insurer's coverage obligations under the Insurance Policy. Further, if a single panel were damaged and not available for purchase on the market, GAIC would have the option to pay for a repair of the single panel and for the reduction in value of the property resulting from one non-matching panel (which presumably would be a minor cost). (Doc. No. 49-3 at 30.) The Loss Payment provision gives GAIC the right to select among the available coverage options, and GAIC would undoubtedly select the least expensive option.

GAIC disagrees, arguing that "[w]hether a reasonable uniform appearance can be achieved is a disputed factual issue that cannot be resolved on summary judgment." (Doc. No. 50 at 12.) The insurer marshals competing evidence from its own retained expert, Jim Borders. (Doc. No. 52.) Borders opines that a reasonable color match can be achieved between the replacement panels and the existing, non-damaged panels through repair methods other than complete replacement of each panel. (*Id.* ¶¶ 7, 9–10.) Borders specifically concludes that the colors of the existing, non-damaged panels can be "purchased, recreated, or even color-matched, if necessary" and that "[s]uch repairs are routine in the industry." (*Id.* ¶ 9.) Further, an identical color match was apparently already achieved during a 2025 test, as evidenced by a photograph in the record. (*Id.* ¶ 10; *see also id.* at 5.)

In light of these competing expert opinions, the court cannot find that GAIC's matching coverage obligations require replacement of the entire ACM panel system. In short, there is a material factual dispute on whether a match can be made. The Association's experts argue that it cannot, while GAIC's expert argues that such a match exists and has already been established during a 2025 test. The conflicting evidence gives rise to a genuine dispute about a material fact that precludes the court from declaring that GAIC's matching coverage obligation currently necessitates replacement of every single ACM panel. *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *25 (S.D.N.Y. June 11, 2021) (finding summary judgment "inappropriate when there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute."). In other words, whether the insurer's coverage obligation requires wholesale replacement of the Clay Tile and Colonial Red panels, or whether some other repair method proposed by GAIC is sufficient, is a factual question reserved for the jury. *SFR Servs., LLC v.*

*Lexington Ins. Co.*, 2021 WL 322367, at *2 (M.D. Fla. Feb. 1, 2021) (finding that "whether non-matching tiles are of 'like kind and quality'" is a jury question); *Trout Brook S. Condo. Ass'n*, 995 F. Supp. 2d 1035, 1044 (D. Minn. 2014) ("[A] jury must determine whether these terms ["similar materials" and "like kind and quality"] obligate [the insurer] to pay for matching shingles on Trout Brook's property.").

## IV. CONCLUSION

For the reasons stated herein, the Motion for Partial Summary Judgment (Doc. No. 49) on Count 1 of the Complaint will be granted in part. The Motion to Strike (Doc. No. 53) will be denied.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge